DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Sandra Williams, appeals from the judgment of the Summit County Court of Common Pleas which convicted her of illegal manufacturing of drugs, aggravated possession of drugs, and child endangering. We affirm.
 I. {¶ 2} On November 8, 2002, the Appellant was indicted by the Summit County Grand Jury on one count of illegal manufacture of drugs, in violation of R.C. 2925.04(A), one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), and one count of child endangering, in violation of R.C. 2919.22(A). Thereafter, on March 13, 2003, a supplemental indictment was filed and Appellant was charged with two additional counts of illegal manufacture of drugs, in violation of R.C. 2925.04(A), one count of aggravated possession, in violation of R.C. 2925.11(A) and one count of child endangering, in violation of R.C.2919.22(A). The State dismissed the original indictment.
 {¶ 3} A bench trial was held and Appellant was found guilty on all remaining counts and sentenced on all counts, except for one count of illegal manufacture of drugs, which the court found to be an allied offense of similar import to the remaining count of illegal manufacture of drugs. It is from this decision that Appellant appeals raising one assignment of error for review.
 II. Assignment of Error
"Appellant's conviction of illegal manufacture of drugs * * *, aggravated possession of drugs * * *, and endangering children * * * was contrary to the manifest weight of the evidence."
 {¶ 4} In her sole assignment of error, Appellant maintains that her convictions for illegal manufacture of drugs, aggravated possession of drugs, and child endangering, were against the manifest of the evidence. We disagree.
 {¶ 5} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing State v. Thompkins (1997), 78 Ohio St.3d 380,390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 6} In the present matter, Appellant was found guilty of illegal manufacture of drugs, in violation of R.C. 2925.04(A), and aggravated possession of drugs, in violation of R.C. 2925.11. R.C. 2925.04(A) prohibits the manufacturing of drugs; "[n]o person shall * * * knowingly manufacture or otherwise engage in any part of the production of a controlled substance." One "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Manufacture" means to "plant, cultivate, harvest, process, make, prepare, or otherwise engage in any part of the production of a drug, by propagation, extraction, chemical synthesis, or compounding, or any combination of the same, and includes packaging, repackaging, labeling, and other activities incident to production." R.C. 2925.01(J). Methamphetamine is a Schedule II controlled substance. R.C. 3719.41, Schedule II (C)(2).
 {¶ 7} One is guilty of aggravated possession if the person knowingly possesses or uses a controlled substance, and the drug involved is a schedule I or II substance, such as methamphetamine. R.C. 2925.11(A) and (C)(1). Furthermore, "[i]f the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount, aggravated possession of drugs is a felony of the second degree." R.C. 2925.11(C)(1)(c).
 {¶ 8} Appellant was also found guilty of child endangering. Pursuant to R.C. 2919.22(A), "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."
 {¶ 9} At trial, several law enforcement authorities of the Akron Police Department testified on behalf of the State. Detective Adam Wahl, of the narcotics unit, explained how Appellant had become a target for investigation. Detective Wahl stated that the narcotics unit had received a complaint about the possible manufacturing of methamphetamine ("meth") by Appellant at her residence, 1670 Vicgross Avenue. He indicated that a "trash pull" was then conducted at the property. On October 28, 2002, at 4:30 a.m., Detective Wahl, along with the assistance of Detectives Brown and McFarland, and Sergeant Michael Stott, searched the numerous garbage bags on the front curb of Appellant's residence. Several incriminatory items relating to the production of meth were found: thirty empty boxes of fifty count matches, two bags of matches, matchbooks with removed strike plates, eight empty bottles of alcohol, tubing, glassware, and twenty-five boxes of pseudoephedrine, both twenty-four and forty-eight count packages. Thereafter, surveillance was set around Appellant's residence and a search warrant for the home was obtained.
 {¶ 10} The search was executed the morning of October 30, 2002. Detective Wahl recalled that Appellant was the only individual present inside the house upon entering the home. He testified that as he walked through the main level of the home, he observed several items consistent with the manufacturing of meth such as bottles of alcohol and liquid HEET. Additionally, he observed a small surveillance monitor hooked up in Appellant's bedroom. There were two cameras mounted outside the home; one camera was pointed in the direction of the front door and the other towards the rear entrance. Detective Wahl asserted that he has encountered video cameras and surveillance systems in the homes of drug dealers in the past.
 {¶ 11} While searching Appellant's bedroom, Detective Brian Callahan confiscated a plastic bag containing .4 grams of meth from her night table. Detective Kandy Shoaff also recovered items associated with the manufacturing of meth. She stated that a shopping list of items needed to produce meth was found inside Appellant's purse. The list contained boxes of pills, denatured alcohol, Red Devil, aluminum foil, and coffee filters. Detective Shoaff indicated that the list was consistent with the items that were recovered in the search of Appellant's garbage. Additionally, $282 in cash and a digital scale were found in Appellant's bedroom and a desk on the main floor of Appellant's residence contained a printed recipe for meth and photographs depicting the process of manufacturing meth.
 {¶ 12} Detective Allen Stump also participated in the search of Appellant's bedroom. He discovered a medicine bottle hidden in a box in Appellant's closet. The bottle contained 17.2 grams of a white substance of which 13.4 grams were determined to be meth. Detective Stump stated that the bulk rate for meth is 3 grams.
 {¶ 13} Detective Glenn Payne, head of the clandestine lab enforcement team and member of the narcotics unit, described the "red phosphorous method" of making meth. He broke the process down into several steps and explained how the various items recovered from Appellant's residence and garbage, such as the pseudoephedrine, tubing, glassware, match strike plates, etc., are often used in the manufacturing of meth. Detective Payne further explained the potential hazards related to the process; "it's very flammable and dangerous and the odors [are] very toxic and hazardous and will cause problems later on down the line" to the respiratory system and mucous membranes as the toxic chemicals permeate the carpet and walls. Also burns could be received from chemical exposure or explosion.
 {¶ 14} Detective Payne stated that he was the "first inside [Appellant's] residence and [had] observed [Appellant] coming up from the basement area." Detective Payne then searched the basement and discovered a "living" meth lab; the lab was not functioning at the time, however, there were bi-level liquids, phosphorous, iodine crystals, and the finished product of meth oil present. Detective Payne indicated that in order to make the lab functional, all that needed to be done was to "plug it in." He noted that several items and evidence relating to the manufacturing of meth were also located in the kitchen, bedroom and living room and stated that there was enough equipment, chemicals, and materials in the home to continue manufacturing.
 {¶ 15} Detective Payne testified that his primary duty was to dismantle the lab. He explained that the apparatus was broken down and several samples of liquid were obtained for testing. Detective Payne stated that lab was destroyed pursuant to OSHA and EPA guidelines due to the potential hazards of the materials and chemicals involved.
 {¶ 16} Special Agent Daniel Wehrmeyer, of the U.S. Department of Justice, Drug Enforcement Administration ("DEA"), testified that at least five times the amount exceeding the bulk rate of meth, approximately 24.4 grams, was found inside Appellant's home. Iodine and red phosphorous, precursors to the manufacturing of meth, were also recovered from the home. Agent Wehrmeyer indicated that the lab discovered in Appellant's basement had the capability of producing up to one ounce of meth, which is a significant amount.
 {¶ 17} Detective Jimmie McFarland, also of the narcotics unit, was the lead detective assigned to the matter. Detective McFarland was involved in the "trash pull" and the search of Appellant's house. He spoke briefly with Appellant who asserted that she lived alone with her eleven-year-old daughter. While the search was being conducted, Detective McFarland recalled Appellant making various comments. She stated that previous renters, named Bobbie and Pete, were responsible for the manufacturing and denied "cooking" or assisting the men. Appellant maintained that she had "kicked [the renters] out" a week or two ago. However, Appellant stated that she "[could not] deny that it's in [her] system." Detective McFarland testified that Appellant offered several excuses each time an incriminating item was discovered. Appellant maintained that all the items were originally located in the basement and they were only moved to the kitchen, bedroom, etc., as she was washing and boxing the items in preparation to turn them over to the prosecutor. Detective McFarland maintained that the police department never received a phone call from Appellant nor did he see any boxed items in preparation to turn them over as Appellant had suggested.
 {¶ 18} Lastly, Ryan ("Ryan") and David ("David") Williams testified on behalf of the defense. Ryan, the stepson of Appellant, stated that he installed the surveillance system at Appellant's home in 2001. He explained that Appellant had wanted a surveillance system in order to monitor past renters she felt were stealing from her. Ryan also indicated that he replaced the lock on the back door of Appellant's home in October of 2002. At that time, he noticed an unusual smell in the basement and observed "trash and stuff" that he had never seen before. Ryan stated that he helped Appellant clean up the mess and discarded the items into black garbage bags.
 {¶ 19} David, the ex-husband of Appellant and adoptive father of Appellant's daughter, explained that there were separate living arrangements in Appellant's basement. He maintained that there were three separate rooms which consisted of an open living area, a shower and sink area, and a bathroom at the top of the stairway leading to the basement. Also at the top of the stairs was an entrance into the home. David testified that Appellant rented this area out to various individuals, including himself, and stated that the area was self-sufficient even though there was no kitchen. He recalled that the most recent renters were named Bobbie and Pete. Additionally, David asserted that Appellant was a good mother who provided her child with housing, shelter and education. He never knew Appellant to use meth.
 {¶ 20} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Appellant of the manufacture and possession of drugs and child endangering. Although conflicting testimony was presented, we refrain from overturning the verdict because the jury chose to believe testimony that was damaging to Appellant. A conviction will not be overturned as against the manifest weight of the evidence merely because the trier of fact believed the prosecution testimony.State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Consequently, we find that Appellant's convictions were not against the manifest weight of the evidence. Appellant's assignment of error is overruled.
 III. {¶ 21} Appellant's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
Carr, J. and Batchelder, J., concur.